**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SHAUNTEL JONES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 12 C 10070** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security** | ) | **Magistrate Judge Michael T. Mason** |
| **Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Claimant Shauntel Jones ("Jones" or "claimant") brings this motion for summary judgment seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied Jones's claim for Supplemental Security Income ("SSI") under Section 1614 of the Social Security Act (the "Act"). 42 U.S.C. § 1382c(a)(3)(A). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons set forth below, claimant's motion for summary judgment [10] is granted and this case is remanded for further proceedings consistent with this opinion.

**I.    Background**

**A.  Procedural History**

Claimant applied for SSI benefits on January 15, 2009. (R. 160.) She alleges that she has been disabled since January 1, 2005, due to asthma, tendinitis of muscles and joints, depression, anxiety, headaches, memory loss, allergies, sinuses, joint and

1

back pain, insomnia, and anemia.  (R. 102, 160-62.)  The claim was initially denied on March 30, 2009, and upon reconsideration on October 9, 2009.  (R. 79, 81.)

On December 1, 2009, claimant filed a written request for a hearing.  (R. 103.) Jones appeared and testified at a hearing before Administrative Law Judge ("ALJ") Jose Anglada on September 24, 2010.  (R. 37.)  Richard Hamersma, a vocational expert ("VE"), also testified at the hearing.  (*Id.*)  On November 29, 2010, ALJ Anglada issued an opinion finding that claimant was not disabled under the Act.  (R. 94.)

On January 18, 2011, Jones filed a request for a review of the ALJ's decision. (R. 159.)  On May 21, 2012, the Appeals Council initially denied claimant's request.  (R. 1-3.)  On October 18, 2012, the Appeals Council set aside its May 21, 2012 denial to consider additional information.  (R. 5-8.)  The Appeals Council subsequently found no reason to review the ALJ's decision after considering that information, and again denied Jones's request for review.  (R. 1-3.)  Claimant then filed this action in the District Court. The parties consented to the jurisdiction of this Court on July 21, 2013 [18] pursuant to 28 U.S.C. § 636(c).

## B.  Medical Evidence

### 1.  Treating Physicians

#### a.  Dr. Kanayo Odeluga

In July of 2008, Jones began seeing Dr. Kanayo Odeluga for joint pain and pain in her hands.  (R. 307.)  Dr. Odeluga diagnosed claimant with multiple joint pain, asthma, rheumatoid arthritis, and depression, and he prescribed various medications. (*Id.*)  On September 19, 2008, Jones visited Dr. Odeluga for a follow-up visit, and he

diagnosed her with asthma. (R. 306.) Dr. Odeluga prescribed Diflucan and Effexor, and noted that he would refer claimant to a rheumatologist when she is ready. (*Id.*)

Dr. Odeluga performed an independent medical evaluation of claimant on March 13, 2009. (R. 311-20.) At that time, Jones complained that her low back pain began a few years prior and had worsened in the last two years. (R. 311.) Jones described the pain as "sharp, constant, and moderate in intensity," and reported that the pain is exacerbated by walking, lying down, bending, lifting, and doing household chores. (*Id.*) Jones also complained of tremors, headaches, numbness in both her hands and feet, asthma and wheezing. (R. 312.) She told Dr. Odeluga that she obtains brief relief with Tramadol and Naprosyn. (R. 311.)

Dr. Odeluga's evaluation noted that Jones was an obese female who weighed 196 pounds and was 64 inches tall. (R. 312.) Dr. Odeluga performed a musculoskeletal examination and found that claimant's spine was normal and that she had a full range of motion. (R. 313.) Dr. Odeluga noted spinous and paraspinal tenderness over the lumbar segment. (*Id.*) Dr. Odeluga examined claimant's upper and lower extremities and found no anatomic deformity, swelling, stiffness, effusion, skin discoloration, or increased skin warmth. (*Id.*) Dr. Odeluga also found that claimant had full range of motion in each joint and grade 5/5 strength in all major muscle groups. (*Id.*) Claimant also had negative straight leg raises on both lower extremities. (*Id.*) Dr. Odeluga noted that Jones had no difficulty with getting on and off the exam table, tandem walking, walking on toes, walking on heels, or hopping. (R. 314.) She did have mild difficulty squatting. (*Id.*) Based upon her history, physical examination, and

medical records, Dr. Odeluga found that Jones appeared to have chronic low back pain, asthma, depression, and allergic rhinitis. (*Id.*)

### b. Dr. Mark Williams

On November 18, 2009, Jones saw Dr. Mark Williams for an annual physical exam. (R. 401.) At her appointment, Jones complained of asthma and joint pains. (*Id.*) Dr. Williams's physical examination revealed normal alignment and mobility of the spine, ribs, and pelvis, and normal gait. (R. 403.) Dr. Williams noted that Jones had a number of problems, including polyarthralgia, temporomandibular joint ("TMJ"), anxiety and depressive disorder. (*Id.*) Dr. Williams ordered a comprehensive metabolic panel, and instructed Jones to continue taking Advair, Diskus, Ventolin, Ferrous Sulfate, and Naproxen. (R. 404.)

On January 6, 2010, Jones returned to Dr. Williams with complaints of body pain, joint pain, and stiffness. (R. 414.) Jones denied back pain, joint swelling, muscle cramps, muscle weakness, and arthritis. (*Id.*) Dr. Williams ordered Vitamin B12/folate, serum panel, and a hepatitis panel. (R. 415.)

On February 25, 2010, Jones complained to Dr. Williams that she had bluish discoloration and pain in her hands and feet. (R. 431.) Dr. Williams made a note regarding Raynaud's Syndrome, and referred Jones to Dr. Adrienne Burford-Foggs, a rheumatologist, for further evaluation and treatment. (R. 432.)

### c. Dr. Adrienne Buford-Foggs

Over the next few months, Jones saw Dr. Burford-Foggs for her joint pain on six occasions. On March 1, 2010, Jones complained that she had experienced pain in her

elbows, hands, knees, and feet for approximately ten years. (R. 433.) Jones also complained of stiffness in the morning lasting three hours, episodic swelling of the wrists, hands and ankles for approximately ten years, and that her hands and feet become cold and turn blue with cold exposure for the past three years. (*Id.*) Jones reported that her pain is exacerbated by activity and carrying grocery bags. (*Id.*) Jones also stated that her pain is relieved by Tramadol and muscle relaxers. (*Id.*) Following the physical exam, Dr. Burford-Foggs found that Jones had normal range of motion and no joint enlargement or tenderness in her extremities. (R. 435.) There was also no musculoskeletal abnormalities. (*Id.*) Dr. Burford-Foggs ordered a Vitamin D lab, and instructed Jones to continue taking her Tramadol as prescribed, to keep her hands and body warm, and to return in two months. (*Id.*) She assessed that Jones suffered from Raynaud's syndrome, arthralgia, and anemia. *(Id.)*

On April 5, 2010, Jones complained of swelling in her feet and hands, cramps in her legs and feet, severe back pain, and morning joint stiffness lasting three hours. (R. 444.) Dr. Burford-Foggs noted the "presence of arthralgias, fatigue, stiffness, and markedly elevated ANA suggested SLE [systematic lupus erythematosus], however, additional tests are warranted." (R. 446.) Dr. Burford-Foggs reported plans to "check anti-ds-DNA, C2, C4, repeat CBC" and instructed claimant to continue Prednisone and Vitamin D as prescribed. (*Id.*)

Jones returned to see Dr. Burford-Foggs on April 19, 2010. (R. 454.) Dr. Burford-Foggs reported "Patient with UCTD [undifferentiated connective tissue disease][1]

---

[1] Undifferentiated connective tissue disease "is used to define conditions characterized by the presence of signs and symptoms suggestive of a systemic autoimmune disease that do not satisfy the classificative criteria for defined connective tissue diseases (CTD)

treated with Prednisone and Plaquenil, comes in for treatment. Her joint pain is controlled. Her review of systems is unremarkable." (*Id.*) Dr. Burford-Foggs also reported that claimant "denies anorexia, chills, dizziness, fatigue, fevers, headache, malaise, sweats, and weight loss." (*Id.*) Jones was instructed to continue taking Plaquenil and Prednisone. (R. 456.)

On May 3, 2010, Jones returned to Dr. Burford-Foggs, complaining of swelling in her feet, low back pain, and leg cramps for approximately two months. (R. 458.) Dr. Burford-Foggs noted that claimant is improving with the exception of Prednisone, and advised Jones to reduce her Prednisone dosage. (R. 458, 460.)

On May 17, 2010, Dr. Burford-Foggs noted that Jones was feeling well and her joint pain had improved, but that Jones complained of severe low back pain with activity. (R. 467.) In her assessment, Dr. Burford-Foggs noted connective tissue disease, and hyperglycemia secondary to Prednisone. (R. 469.) She also instructed claimant to decrease Prednisone, and continue Robaxin as prescribed for low back pain. (*Id.*) On June 7, 2010, claimant complained of "tightness" of the right leg and swelling of the lower extremities, both of which were improving. (R. 470.) Dr. Burford-Foggs reported that Jones had dyspnea with exertion. (*Id.*) Dr. Burford-Foggs instructed Jones to continue her current treatment. (R. 472.)

Both Dr. Williams and Dr. Burford-Foggs wrote letters regarding Jones's medical conditions and ability to work. (R. 475-76.) Dr. Williams wrote a letter dated April 27, 2010, stating, "Ms. Shauntel Jones is a patient at Komed and currently has multiple

---

such as systemic lupus erythematosus (SLE), Sjögren's syndrome (SS), rheumatoid arthritis (RA) and others." http://www.ncbi.nlm.nih.gov/pubmed/17110308.

medical conditions consisting of low back pain, polyarthralgia, Mixed Connective Tissue Disease, Raynaud's Syndrome, asthma and others that prevent patient from maintaining gainful employment.  Ms. Jones is seeing a rheumatologist for her joint related pains who also has written a letter about her not being able to maintain employment currently."  (R. 476.)  Dr. Burford-Foggs wrote a letter dated June 7, 2010, stating, "Ms. Jones has undifferentiated connective tissue disease, asthma, and obesity. Because of dyspnea and joint pain, she is unable to work at this time."  (R. 475.)

### d.  Eugene Kang

On April 6, 2009, Jones underwent a psychiatric examination by Dr. Eugene Kang.  (R. 337.)  He diagnosed Jones with generalized anxiety disorder, major depression single episode, and panic disorder.  (*Id.*)  He noted that claimant's mood was angry, annoyed and agitated.  (R. 338.)  He also noted the following manifestations of her mental disorder: worry, fatigue, poor concentration, irritability, sleep disturbance, tension, excessive guilt, diminished self esteem, insomnia, hopelessness and suicidal ideas.  (*Id.*)  He also noted that she was unwilling to attempt a therapist relationship and she did not agree to a more complete psycho-social assessment.  (R. 338-39.)

### 2.  State Agency Physicians

On September 8, 2009, Dr. Sujatha Neerukonda performed an internal medicine consultative examination of claimant.  (R. 362-71.)  Jones's chief complaints were asthma, TMJ, multiple painful joints, low back pain, depression, and anxiety.  (R. 363.) Claimant reported that she had experienced pain in her joints on and off for ten years, and that her low back pain had worsened in the last year.  (*Id.*)  Jones also complained

of pain in her left ankle. (R. 364.) Claimant reported that she had repeatedly sprained her ankle. (*Id.*) Jones also complained that her low back pain is aggravated with walking and diminished when sitting. (*Id.*)

Dr. Neerukonda's physical evaluation revealed no limitation of movement in claimant's cervical spine, shoulders, elbows, wrists, hips, knees, and ankles. (R. 365.) Dr. Neerukonda found that there was lumbar spine tenderness present in L3, L4 at the midline. (*Id.*) Claimant was able to do heel walk, toe walk, squat, tandem gait, and get on and off the examination table with no problems, and a straight leg raise was negative. (*Id.*) An examination of claimant's hands revealed that her bilateral fist was 100%, grip was 5/5, and fine dexterity was normal. (*Id.*) Dr. Neerukonda assessed bronchial asthma, TMJ, depression and anxiety, chronic generalized arthralgia in multiple joints, and possible fibromyalgia. (*Id.*)

On October 6, 2009, Dr. Carl Hermsmeyer, PhD., performed a psychiatric review technique and a mental residual functional capacity ("RFC") assessment. (R. 372-89.) The psychiatric review technique noted co-existing non-mental impairments that required a referral to another medical specialty. (R. 372.) Dr. Hermsmeyer found that claimant had dysthymic disorder and anxiety disorder. (R. 375, 377.) In terms of the "B Criteria," Dr. Hermsmeyer also noted that claimant had a mild degree of limitation for restriction of activities of daily living, a moderate degree of limitation for difficulties maintaining social functioning, and a moderate degree of limitation for difficulties in maintaining concentration, persistence, or pace. (R. 382.) He noted no episodes of decompensation. (*Id.*) He also noted no evidence of "C Criteria." (R. 383.)

The mental RFC assessment showed that Jones was moderately limited in her

ability to understand, remember and carry out detailed instructions, and moderately limited in her ability to maintain attention and concentration for extended periods. (R. 386.) Dr. Hermsmeyer noted no significant limitations in the remaining categories. (*Id.*) He also noted that "the mental status exam and the activities of daily living indicate the severity does not meet or equal any mental listing, but is more than non-severe." (R. 388.)

On October 7, 2009, Dr. James Madison performed a physical RFC assessment. (R. 390-97.) This assessment showed that Jones could occasionally lift or carry fifty pounds; frequently lift or carry twenty-five pounds; stand or walk with normal breaks for about six hours in an eight-hour workday; sit with normal breaks, for a total of about six hours in an eight-hour workday; and do unlimited pushing and/or pulling other than what was shown for lift or carry. (R. 391.) There were no postural, manipulative, visual or communicative limitations established. (R. 392-94.) Dr. Madison did note that Jones should avoid concentrated exposure to extreme cold, extreme heat, humidity, noise, vibration and hazards (such as machinery, heights, etc.). (R. 394.) Dr. Madison also stated that claimant's indicated limitations were not fully supported. (R. 397.) He noted no limitations in movement of the spine, shoulders, elbows, wrists, hips, knees and ankles. (*Id.*) Her gait was normal, her straight leg raise was negative, her grip was 5/5, her dexterity was normal and muscle strength in all extremities was 5/5. (*Id.*) There was no evidence of cervical or lumbar nerve root compression, and sensation was intact to touch. (*Id.*) For these reasons, Dr. Madison concluded that "[p]hysical limitations as indicated are viewed as only partially credible as the severity is not fully supported." (*Id.*)

9

### C. Claimant's Testimony

Jones was born on December 27, 1967. (R. 41.) She is divorced, and has a mentally ill adult son. (R. 42, 44.) Her son is bipolar and has a left temporal cerebral dysfunction. (R. 44.) Jones has an 11th grade education. (R. 42.) She lives alone in a rented apartment, but her son sometimes stays with her. (*Id.*)

At the time of the hearing, Jones was unemployed. (*Id.*) The last job she held was in 2005 as a substitute teacher at a school for mentally ill and disabled adults and children. (R. 43.) Jones said that the school would call her when they needed her to come in to work, but that she was often unable to work because she had to take care of her son. (R. 43-44.) She stated that if she was able to work, she would be at the school from 8:00 am or 9:00 am until about 2:30 pm. (R. 44.) Ultimately, the school stopped calling her because she could rarely come in, and then she moved away. (R. 47.) Prior to 2005, she worked at a nursing home for about three months, and she had also worked as a security officer for just a few weeks. (R. 44-45.)

Jones testified that during the day, she often has to take care of her son. (R. 46.) Sometimes she takes him to his therapy appointments, which he has once a month. (R. 48.) She also has to monitor his prescriptions because at times he cannot be relied on to take the appropriate medication on his own. (R. 49-50.) Jones testified that she does some of household chores, such as laundry, but she is in pain the next day. (R. 53.) Her son does some of the cleaning and her son's father takes her grocery shopping. (*Id.*) She also stated that her hobbies include cooking, listening to music, and talking on the phone with her mother. (*Id.*)

Jones testified that her back pain started when she had her son, about twenty

years ago.  (R. 51.)  Jones does not know the source of her back pain.  (R. 60.)  Her

back hurts when she is walking or trying to clean.  (*Id.*)  Her back also hurts at night,

and occasionally wakes her up at night.  (*Id.*)  She only sometimes gets relief from the

medication she has been prescribed for this pain.  (R. 52.)  She said she also has joint

pain, asthma, and TMJ, which cause her pain.  (R. 54.)  She also testified that she has

an autoimmune disease and that her doctor told her it was some type of connective

tissue disease.  (R. 52.)  Jones said that she is being treated for Raynaud's Syndrome,

sinuses, and allergies.  (R. 54.)

Jones stated that her primary care physician referred her to a rheumatologist

because of her lab work.  (R. 56.)  She testified that in addition to her joint pain, her

hands and feet turn blue and get numb.  (*Id.*)  Jones also has pain in her fingers, wrists,

elbows, knees, hips, ankles, and feet.  (R. 60.)  Jones said that she has joint pain every

day and that if she cooks or cleans, the pain worsens.  (*Id.*)  She stated that she sees

her rheumatologist every two to three weeks, and her primary care physician (for her

asthma, sinuses, allergies and TMJ) every two months.  (R. 55.)

In addition to the joint pain, Jones stated that her TMJ causes her to experience

pain in her jaws, behind her ears, and in her neck and head.  (R. 66.)  This pain is about

every other day and it affects her concentration, her ability to chew anything and her

ability to sleep.  (R. 66.)  She also has an asthma attack about every other day,

depending on the weather, and she uses an inhaler once or twice every day.  (R. 67.)

Jones testified that she gets swelling in her feet and hands about two to three

days a week.  (R. 64-65.)  Jones said that when her hands get swollen, it affects her

ability to grasp things, and carry out personal hygiene.  (R. 65.)  Jones said that she has

weakness, swelling, and numbness in her elbows.  (*Id.*)  Jones testified that the swelling and numbness in her feet also affects her ability to walk, and sometimes her ability to stand.  (*Id.*)

Jones reported that she takes medication every day.  (R. 52.)  She said that she takes Plaquenil, muscle relaxers, Naproxen, iron pills, Kuvar, Advair, and Albuterol.  (R. 57.)  She occasionally gets relief from her medication.  (R. 52.)  She testified that she did not take her Plaquenil the morning of the hearing because this medication makes her dizzy, lightheaded, and gives her diarrhea.  (R. 52.)  Claimant also testified that she used to take Prednisone but stopped taking it because "it was turning [her] into a diabetic, and [her] vision was so blurry [she] couldn't see."  (R. 57.)

Jones testified that she can probably lift and carry about five pounds; walk two to three blocks before she has to rest; stand for forty to forty-five minutes; and sit for about fifteen minutes.  (R. 57-58.)  Jones said that her joint and back pain and asthma prevent her from working.  (R. 60.)  The joint pain is in her fingers, wrists, elbows, knees, hips, ankles and feet, and the intensity of the pain depends on her activity level.  (*Id.*)  Her back pain is also worse when she is walking or doing more household activity, such as cleaning.  (*Id.*)  Jones testified that "three days out of the week" her pain is so debilitating that she has to stay at home.  (R. 69.)

In addition, Jones receives some treatment for anxiety and panic attacks.  (R. 58.)  She has seen a therapist and a psychiatrist, and for a time, she was taking Effexor and Prozac.  (*Id.*)  She stopped taking these medications in order to pay for her autoimmune disease medication.  (R. 59.)  She testified that she still suffers from anxiety attacks about three times each month, which will last ten to fifteen minutes each

time.  (*Id.*)  She also stated that these attacks are triggered by stress, such as the stress of taking care of her son, paying their bills, and not being able to do things on her own or support herself.  (*Id.*)

### D.  Vocational Expert's Testimony

VE Hamersma also testified at the hearing.  (R. 69-74.)  Based on Jones's minimal work earnings, she was assumed to have no past relevant work history.  (R. 71.)  The ALJ first asked the VE to "assume an individual in the younger age category, with limited education, and no past relevant work, and assume further that such individual could lift and carry twenty pounds occasionally and ten pounds frequently, can be on her feet standing, walking about six hours in an eight-hour workday and six hours with normal rest periods.  She should not work at heights, climb ladders or frequently negotiate stairs; should not be exposed to concentrations of fumes, dusts, odors, gasses, or poorly ventilated areas; should not be exposed to moving or dangerous machinery; can only occasionally stoop, crouch, kneel or crawl; and may only have occasional contact with the general public and is not suited for work requiring intense focus and concentration for extended periods."  (R. 71-72.)

VE Hamersma responded that there are several jobs that such an individual would be able to perform.  (R. 72.)  One job would be an assembly position (there are approximately 8,000 of these jobs in the Chicago Metropolitan Area).  (*Id.*)  A second job would be in inspection, which is a light, unskilled job (there are approximately 5,000 of these jobs in the geographical area).  (*Id.*)  A third job would be a hand packager (there are 7,000 of these jobs in the geographical area).  (*Id.*)  VE Hamersma testified that these jobs are consistent with the Dictionary of Occupational Titles ("DOT"), with

the exception of the hand packager, which is listed in the DOT as medium. (*Id.*) VE Hamersma also said that a tolerable level of absenteeism in these jobs is two days a month. (R. 73.) VE Hamersma testified that if an individual missed two or three days a week, she would be precluded from working. (*Id.*)

On cross-examination, claimant's attorney asked "in addition to all of the limitations the Judge provided in the hypothetical, if the person had swelling in their hands...thirty percent of the time, how would that affect the ability to do either assembly or hand packaging?" (*Id.*) The VE responded that the individual with those limitations cannot do those jobs. (*Id.*) Claimant's attorney also asked whether there is any walking requirement on the inspection job. (*Id.*) The VE responded that the walking requirement is very limited. (*Id.*) The inspection position would involve sitting in a chair or sometimes standing and watching things go by on an assembly line. (R. 74.) If there is a defective product, the person would pull it off the line. (*Id.*) The VE said that a person would have to be on task eighty-eight to ninety percent of the time in the inspection position. (*Id.*) The VE said that if an individual was off task fifteen percent of the time due to headaches, nausea, or diarrhea, then she would not be able to perform the inspection position. (*Id.*)

## II. Legal Analysis

### A. Standard of Review

This Court must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla of proof."

*Keeple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001). It means "evidence a reasonable person would accept as adequate to support the decision." *Murphy v. Astrue*, 496 F.3d 630, 633 (7th Cir. 2007); *see also Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion") (citation and quotations omitted). In determining whether there is substantial evidence, the Court reviews the entire record. *Keeple*, 268 F.3d at 516. However, our review is deferential. *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2003) (quoting *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).

Nonetheless, if, after a "critical review of the evidence," the ALJ's decision "lacks evidentiary support or an adequate discussion of the issues," this Court will not affirm it. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (citations omitted). While the ALJ need not discuss every piece of evidence in the record, he "must build an accurate and logical bridge from the evidence to [the] conclusion." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Further, the ALJ "may not select and discuss only that evidence that favors his ultimate conclusion," *Diaz*, 55 F.3d at 308, but "must confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). Ultimately, the ALJ must "sufficiently articulate [his] assessment of the evidence to assure us that [he] considered the important evidence and... to enable us to trace the path of [his] reasoning." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002) (*quoting Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999)).

### B. Analysis under the Social Security Act

In order to qualify for supplemental security income, a claimant must be "disabled" under the Act. A person is disabled under the Act if "he or she is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(C)(I). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon*, 270 F.3d at 1176. The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001). If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

The ALJ followed this five-step analysis. At step one, the ALJ found that Jones was not engaged in substantial gainful activity since December 30, 2008, the application date. (R. 87.) At step two, the ALJ determined that Jones had the following severe impairments: anxiety disorder, arthritis, and asthma. (*Id.*) The ALJ discussed Jones's obesity, but did not find that it was severe. (*Id.*) At step three, the ALJ found that Jones's severe physical impairments do not meet the criteria of any listed physical impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). (R. 88.) He

also concluded that claimant's mental impairment does not meet or medically equal the criteria of Listing 12.04 (Affective Disorders).  (*Id.*)  The ALJ then determined that Jones has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. 416.967(b), except that she is subject to the following non-exertional limitations: she cannot engage in activities involving heights, ladders, frequent negotiation of stairs, or more than occasional stooping, crouching, kneeling, or crawling; she cannot be exposed to concentrations of fumes, odors, dusts, gases, or poorly ventilated areas; she cannot work in environments with moving or dangerous machinery; she cannot engage in more than limited contact with the public; and she cannot work in environments where intense concentration or attention is required for extended periods of time.  (*Id.*)  At step four, the ALJ found that Jones has no past relevant work, and thus transferability of job skills is not an issue.  (R. 92.)  At step five, the ALJ concluded that considering Jones's age, education, work experience, and RFC, jobs exist in significant numbers in the national economy that she can perform.  (R. 93.)  As a result, the ALJ found that Jones has not been under a disability from December 30, 2008 through the date of his decision.  (*Id.*)

Jones now argues that the ALJ erred (1) in failing to consider whether her physical impairments met or medically equaled Listing 14.06, (2) in failing to consider her undifferentiated connective tissue disease in assessing her disability, and (3) in evaluating claimant's credibility.  We address each of claimant's arguments below.

## III. Discussion

### A. The ALJ's Step Three Analysis Was Insufficient.

Jones first argues that the ALJ erred at step three when he concluded that Jones's physical impairments did not meet or equal any of the listed impairments in the Listings. Jones argues that at the very least, the ALJ should have considered her condition in light of Listing 14.06, which refers to undifferentiated and mixed connective tissue disease. In Listing 14.06, this disease is described as "repeated manifestations of undifferentiated or mixed connective tissue disease, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at a marked level: (1) limitation of activities of daily living; (2) limitation in maintaining social functioning; and (3) limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace." 20 C.F.R. Pt. 404, Sbpt. P, App. 1, § 14.06B.

In considering whether a claimant's medical impairments meet or medically equal the listing at step three, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing. *Barnett v. Barnhart*, 381 F.3d 664, 668-69 (7th Cir. 2004) (finding the ALJ's "two sentence consideration of the Listing of Impairments [was] inadequate and warrants remand"); *Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2002) ("failure to discuss or even cite to a listing, combined with an otherwise perfunctory analysis, may require remand"). The ALJ is also required to evaluate any evidence of the required criteria that is favorable to the claimant. *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006). If the ALJ fails to include some detail in this analysis, it is difficult for the Court to determine whether the ALJ adequately considered the relevant evidence. *Id.* ("[the ALJ's] failure here to evaluate any of the evidence that

potentially supported [claimant's] claim does not provide much assurance that he adequately considered [the] case").

In this case, at step three, the ALJ provided a detailed discussion of Jones's mental impairments, as well as an analysis of why these impairments did not meet or medically equal the applicable listing. But the ALJ failed to provide any discussion about Jones's physical impairments, including her undifferentiated connective tissue disease. The ALJ only stated his conclusion that Jones's severe "physical impairments do not meet the criteria of any listed physical impairment....[and] the record does not include any findings that indicate that the physical impairments, individually or in combination, are equal in severity to the criteria of any listed physical impairment." (R. 88.) There was no further discussion of Jones's physical impairments. We find that the ALJ's failure to provide any analysis with respect to her physical impairments requires remand. He did not address the fact that claimant had been diagnosed with undifferentiated connective tissue disease. At a minimum, the ALJ was required to refer to Listing 14.06 and explain why, despite claimant's diagnosis, her condition did not meet or equal the criteria included in Listing 14.06. Instead, the ALJ simply concluded that her physical impairments did not meet any listing. As a result, we find that the ALJ's step three analysis was insufficient and requires remand. *See e.g., Brindisi*, 315 F.3d at 786 (remanding for further discussion when the ALJ's decision was "devoid of any discussion that would enable a meaningful judicial review.")

**B. The ALJ Failed to Adequately Consider Her Undifferentiated Connective Tissue Disease.**

Jones next argues that the ALJ erred in failing to consider her undifferentiated connective tissue disease in his analysis. In determining whether a claimant is entitled to benefits, the ALJ is not required to discuss every piece of testimony and evidence in the record. *Diaz v. Charter*, 55 F.3d 300, 308 (7th Cir. 2005). However, the ALJ is obligated to consider all relevant medical evidence and may not selectively pick the facts to support a non-disability finding while ignoring evidence that points to a disability finding. *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). In addition, any impairment that is "established by medical evidence consisting of signs, symptoms, and laboratory findings" must be examined before an ALJ can determine whether an individual is disabled. *See* 20 C.F.R. § 404.1508. The ALJ also must articulate, at some minimal level, his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning. *Diaz*, 55 F.3d at 307.

Here, the ALJ stated that the medical records "contain very little information regarding the claimant's alleged impairments and corresponding treatment." (R. 91.) However, there are medical records from six visits with Dr. Burford-Foggs detailing Jones's complaints, diagnoses, and treatment plans. (R. 443-40, 444-52, 454-56, 458-61, 467-69, 470-73.) Dr. Burford-Foggs diagnosed Jones with undifferentiated connective tissue disease after treating her for a period of time. (R. 454-56.) She noted that Jones had complained of joint pain and stiffness, swelling of her wrists, hands, and ankles, and cold and blue hands and feet when exposed to cold, and that Jones had cramps in her legs and feet, severe back pain. (R. 433-40, 444-56.) Jones was also being treated with Prednisone and Plaquenil for her condition. (*Id.*) While it is true that some of the medical records here consist of Jones's subjective complaints, the ALJ did

not adequately explain why he was disregarding Dr. Burford-Foggs's diagnosis, or what objective medical evidence he was relying on to do so.   The failure to build the requisite "logical bridge" requires remand here.

In addition, Dr. Burford-Foggs and Dr. Williams both opined that because of Jones's undifferentiated connective tissue disease, she was incapable of working. Again, without much explanation, the ALJ disregarded these opinions.  Although the ultimate  determination of whether a claimant is disabled is one that is reserved for the ALJ, the ALJ should have explained in further detail his basis for disregarding these opinions.  As the Seventh Circuit has pointed out, "the pertinent regulation provides that 'a statement by a medical source that you are...unable to work' does not mean that we will determine that you are disabled." *Bjornson v. Astrue,* 671 F.3d 640, 647 (7th Cir. 2012) (*citing* 20 C.F.R. § 404.1527(e)(1)).  The Court explained, however, that "[t]hat's not the same as saying that such a statement is improper and therefore to be ignored." *Id.*  The ALJ should have, at least, "minimally articulated" what evidence he was relying on to disregard these opinions.  His broad statements that her limitations were not supported by the treatment records is not enough.  "Although the ALJ need not discuss every piece of evidence in the record, he must confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004).

Claimant makes a similar argument that the ALJ failed to consider the symptoms she is suffering from as a result of her undifferentiated connective tissue disorder.  In particular, she asserts that the ALJ should have considered her hand and wrist pain and numbness in formulating her hypothetical for the VE and in subsequently formulating

her RFC.  An ALJ's hypothetical questions to a VE must include all limitations supported by medical evidence in the record.  *Simila v. Astrue*, 573 F.3d 503, 520 (7th Cir. 2009); *Indoranto*, 374 F.3d at 474 ("[i]f the ALJ relies on testimony from a vocational expert, the hypothetical question he poses to the VE must incorporate all of the claimant's limitations supported by medical evidence in the record).

Here, the ALJ did not include any mention of Jones's symptoms of wrist and hand pain and numbness in formulating his RFC for Jones.  (R. 89.)  The treatment notes from both Dr. Williams and Dr. Burford-Foggs also detail Jones's complaints of hand and finger pain and/or swelling on numerous occasions.  (R. 431-32, 433-40, 444-54.)  The ALJ was required to discuss these records and whether these symptoms could limit her ability to work.  His failure to do so under these circumstances requires remand.  *Indoranto*, 374 F.3d at 474 (remanding because "notably absent from the ALJ's order is a discussion of how [claimant's] headaches and blurred vision affected her ability to work").  On remand, the ALJ should address whether claimant's hand and wrist pain should be factored into her RFC.

### C.  The ALJ Erred in Evaluating Claimant's Credibility

Jones's final argument is that the ALJ erred in evaluating her credibility. Because the ALJ is in a superior position to judge the credibility of the claimant, the ALJ's credibility finding will only be reversed if it is "patently wrong."  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).  However, although "credibility determinations are entitled to special deference, ...the ALJ is still required to build an accurate and logical bridge between the evidence and the result."  *Pratt v. Colvin,* No. 12 C 8983, 2014 WL 1612857, at *6 (7th Cir. 2014) (*quoting Castile v. Astrue,* 617 F.3d 923, 929 (7th Cir.

2010)).  An ALJ is required to "carefully evaluate all evidence bearing on the severity of pain and give specific reasons for discounting a claimant's testimony about it."  *Id.* (quoting *Martinez v. Astrue,* 630 F.3d 693, 697 (7th Cir. 2011)).

The ALJ must also comply with the requirements of the Social Security Ruling 96-7p when assessing the credibility of statements.  SSR 96-7p, 1996 WL 374186 at *4; *Brindisi*, 315 F.3d at 787(citing *Steele*, 290 F.3d at 942).  SSR 96-7p requires that the "reasons for the credibility finding must be grounded in evidence and articulated in the determination or decision.  It is not sufficient to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'"  SSR 96-7p, 1996 WL 374186, at *4.  The ALJ's determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  *Id.*

Here, we find that the ALJ did not adequately justify his adverse credibility determination.  First, he improperly used the boilerplate language that the Seventh Circuit has repeatedly criticized.  *Bjornson v. Astrue*, 671 F.3d 640, 645-46 (7th Cir. 2012) (the ALJ's "meaningless boilerplate" language "fails to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that claimant's complaints were not credible").  The use of the boilerplate language can be harmless if the ALJ also offers other reasons to support his credibility finding.  *Pratt*, 2014 WL 1612857, at *7 ("the ALJ's use of this boilerplate language alone is not enough

to warrant a reversal or remand if the ALJ otherwise identifies information that justifies a credibility determination."). In this case, the ALJ failed to satisfy this standard.

The ALJ relied upon two inappropriate bases for finding that Jones's testimony was not credible. First, he stated that her "allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty." However, claimant's testimony about her symptoms "may not be disregarded solely because they are not substantiated by objective medical evidence." SSR 96-7p, 1996 WL 374186, at *1. Under SSR 96-7p, in addition to objective evidence, the ALJ must consider (1) the claimant's daily activities; (2) the duration, frequency, and intensity of pain; (3) the precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) any other functional restrictions. 1996 WL 374186, at *3. An ALJ must also consider subjective complaints of pain if the claimant has established a medically determined impairment that could reasonably be expected to cause the pain. *Moore v. Colvin,* 743 F.3d 1118, 1125 (7th Cir. 2014). Here, Jones has established that she suffers from undifferentiated connective tissue disease, which could reasonably be expected to cause her symptoms. The ALJ briefly discussed some of the factors outlined above, but failed to build a logical bridge between the evidence and his conclusions. *See Smith v. Astrue*, 467 Fed. Appx. 507, 511 (7th Cir. Mar. 12, 2012) (holding credibility assessment deficient where ALJ's opinion "tick[ed] off certain medical evidence," but did "not specify how the evidence undermines [the claimant's] credibility or which statements the ALJ found not credible."); *see also Moore*, 743 F.2d at 1124 ("the error here is the failure to address all of the evidence and explain the reasoning

behind the decision to credit some evidence over the contrary evidence"). Therefore, his first basis for finding her testimony not credible is inadequate.

Second, the ALJ stated that "even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision." (*Id.*) As we have already discussed in detail above, the ALJ failed to sufficiently articulate the "weak medical evidence" that he is relying on here, and "an ALJ may not base a decision solely on a lack of objective corroboration of complaints of pain." *Pratt*, 2014 WL 1612857, at *10. Moreover, "the finding on the credibility of the claimant's statements cannot be based on an intangible or intuitive notion about an individual's credibility." *See* SSR 96-7p, 1996 WL 374186, at *4. If the ALJ believed that the medical evidence does not support Jones's allegations, he is required to point to specific inconsistencies. *Zurwaski*, 245 F.3d at 887.

Finally, the ALJ also improperly discounted Jones's credibility because she "admitted that he [sic] has to care for his [sic] disabled son." (R. 92.) The ALJ cannot use Jones's ability to care for her son as a basis to find her testimony not credible. *See Shramek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000) (claimant's ability to care for the home and her children was not a basis to find her testimony incredible because "[s]uch work by its nature provides the type of flexibility to alternate standing, sitting and walking, and to rest...when necessary"). The ALJ failed to build a logical bridge between the evidence and his conclusion that Jones was not credible, and this failure requires remand. *Pratt,* 2014 WL 1612857, at *10 ("[b]ecause the ALJ's credibility

assessment lacks the minimum requirements for specificity and support, it must be reconsidered on remand.").

## IV. Conclusion

For the reasons set forth above, Jones's motion for summary judgment is granted. This case is remanded to the Social Security Administration for further proceedings consistent with this Opinion. It is so ordered.

ENTER:

_____

**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated: May 30, 2014**